# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PETER HILBURN,** | Civil No. 7-6064 |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **STATE OF NEW JERSEY DEPARTMENT OF CORRECTIONS,** *et al.*, | |
| **Defendants.** | |

This matter comes before the Court on Defendant Alfaro Ortiz's post-trial motion for: (1) an order pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law; (2) an order pursuant to Federal Rule of Civil Procedure 59(a) granting a new trial; and (3) an order pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the judgment against him. Also before the Court is Defendant Ortiz's renewed motion for mistrial and his motion to waive the supersedeas bond requirement pursuant to Federal Rule of Civil Procedure 62.

For the reasons explained below, the Court **DENIES** Defendant's post-trial motion, **DENIES** Defendant's motion for mistrial, and **GRANTS** Defendant's motion for waiver of the supersedeas bond requirement subject to certain conditions.

## I.  Procedural and Factual History[1]

On December 21, 2007, Plaintiff filed this action against his employer, the

---

[1] For the sake of uniformity, the Court uses the same trial transcript citation format that the parties used in their briefs: 1T = Transcript of March 19, 2012 proceedings, ECF No. 198; 2T = March 19, 2012 proceedings continued; ECF No. 197; 3T = March 20, 2012 proceedings, ECF No. 210; 4T = March 21, 2012 proceedings, ECF No. 199; 4TA = March 23, 2012 proceedings, ECF No. 200; 5T = March 26, 2012 proceedings, ECF No. 201; 6T = March 28, 2012 proceedings, ECF No. 209; 7T = March 29, 2012 proceedings, ECF No. 202; 8T = March 30, 2012 proceedings, ECF No. 203; 9T = March 30, 2012 proceedings continued, ECF No. 204; 10T = April 2, 2012 proceedings, ECF No. 205; 11T = April 3, 2012 proceedings, ECF No. 206; and 12T = April 5, 2012 procfeedings, ECF No. 208.

State of New Jersey Department of Corrections (the "DOC"), and two of his supervisors, Alfaro Ortiz and William Plantier. During the time relevant to this action, Plaintiff was an Assistant Superintendant at the East Jersey State Prison (the "Prison"). Defendant Ortiz was the Administrator of the Prison, and Defendant Plantier was the Prison's Director of Operations. Plaintiff contended that he exercised his First Amendment rights in the spring and summer of 2005 by complaining to his immediate supervisor, Defendant Ortiz, about allegations of illegal bid-rigging at the DOC and by reporting the bid-rigging to outside law enforcement officials. The complaint attempted to plead causes of action for retaliation in violation of 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et seq.* (the "NJCRA"), and violations of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (the "FMLA"), among other claims. Plaintiff alleged that Defendant Ortiz retaliated against him by, among other conduct, scheming to have Plaintiff fired. As part of that alleged scheme, Defendant Ortiz purportedly placed Debbie Schoffstall, another DOC employee, in Plaintiff's office in the fall of 2005 with the intent that she record Plaintiff making lewd, racist, and otherwise offensive statements to create a basis for his termination. Plaintiff further alleged that this scheme was successful as he was terminated from his employment on or around April 8, 2006, while he was out on medical leave. On January 9, 2008, Plaintiff filed an amended complaint, adding Defendants Gerald Kennedy, Fred Armstrong, James Barbo, and George Haymen. All of the newly added defendants were employed in some capacity by the DOC at the relevant time.

On February 22, 2010, the Court granted Defendants' motion to dismiss in part and dismissed a number of Plaintiff's claims, including Plaintiff's Section 1983 and NJCRA claims against the DOC and against all of the other defendants in their official capacities. On December 23, 2010, the Court granted Defendants' motion for summary judgment in part and dismissed all claims against Defendants Kennedy, Armstrong, Barbo, and Haymen, and dismissed several other claims against the remaining Defendants.

On March 19, 2012, the Court began trial on Plaintiff's remaining claims: retaliation in violation of Section 1983 and the NJCRA[2] against Defendants Ortiz and Plantier in their individual capacities, and violation of the FMLA against Defendants Ortiz, Plantier, and the DOC. On April 4, 2012, the jury returned its unanimous verdict, finding for Plaintiff on his claims for retaliation against

---

[2] At trial, the Court treated Plaintiff's NJCRA and Section 1983 claims as coterminous on the facts before it and instructed the jury accordingly. (11T 158:24-159:7); *see also Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (citing cases analyzing NJCRA claims through lens of Section 1983 case law). Counsel for all parties consented to this treatment. (11T 4:7-17). In the remainder of this opinion, the Court refers solely to Plaintiff's Section 1983 claim but the Court notes that its analysis applies equally to Plaintiff's NJCRA claim for the purposes of these motions.

Defendant Ortiz and otherwise finding for Defendants. The jury awarded Plaintiff $659,715 in compensatory damages against Defendant Ortiz. On April 5, 2012, the Court held a supplemental hearing on punitive damages, and the jury returned a special verdict that same day awarding Plaintiff an additional $50,000 in punitive damages against Defendant Ortiz.

On May 7, 2012, Defendant Ortiz filed the pending motions. The parties completed their briefing on June 19, 2012, and the Court held oral argument on July 3, 2012. The Court will address each motion in turn.

## II. Motion for Judgment As a Matter of Law Pursuant to Fed. R. Civ. P. 50(b)

Defendant Ortiz first argues that he is entitled to judgment as a matter of law. The Court disagrees.

"A motion made pursuant to Fed. R. Civ. P. 50 should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 n.8 (3d Cir. 2009). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Id.*

Defendant Ortiz argues that he cannot be liable under Section 1983 because there was insufficient evidence from which a reasonable jury could find that he participated in, made, or influenced the decision to terminate Plaintiff. On its surface, Defendant Ortiz's argument appears to only attack the sufficiency of the evidence at trial, but at its core, the argument also asks the Court to resolve a number of related legal questions because the sufficiency of the evidence turns on whether the Court accepts Defendant's construction of Section 1983 law. On review, the Court finds that it correctly construed the relevant law at trial and that the evidence was sufficient to support the jury's verdict.

For the sake of clarity, the Court will address Defendant Ortiz's legal arguments and evidentiary arguments separately.

### A. The Court's Interpretation of the Law Pertaining to Section 1983 Claims

To state a claim under Section 1983 for violation of First Amendment rights, a plaintiff must plead the following elements: (1) constitutionally protected

conduct; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Tp.*, 463 F.3d 285, 296 (3d Cir. 2006). At trial, the court typically decides the first element as a matter of law and then instructs the jury as to the nature of the plaintiff's protected activity. *See* Model Civ. Jury Instr. 3d Cir. 7.4 (2011). Similarly, at trial the Court need not instruct the jury regarding the second element where the element is not in dispute. *See id.* cmt. Thus, as the Third Circuit's Model Jury Instruction 7.4 indicates, the elements the plaintiff must prove at trial to establish his or her case are: (1) that the defendant took a specific adverse action against the plaintiff; and (2) that the plaintiff's protected activity was a motivating factor in the defendant's decision to take that adverse action.

Defendant Ortiz's argument revives an issue that Defendants raised at trial during discussion of how the Court should charge the jury with respect to the first element regarding an adverse action. During the charge conference, the Court proposed instructing the jury that it must find for Plaintiff if Plaintiff proved that either Defendant "engaged in conduct that resulted in" Plaintiff's termination. By contrast, Defendants requested an instruction that the jury could find for Plaintiff only if he proved that either of the Defendants "participated in the decision to terminate" him. (11T 4:20-6:3).

At the time of the charge conference, defense counsel focused only on a line of authority holding that in order for an individual defendant to be found liable under Section 1983, the individual defendant must be "personally involved" in depriving the plaintiff of his constitutional rights and cannot be liable "solely [through] the operation of *respondeat superior.*" *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). The Court did not find this argument convincing because Plaintiff sought to hold Defendants Plantier and Ortiz liable based on their conduct and not on the conduct of their subordinates or other individuals.[3] The

---

[3]  While it is true that an individual must be personally involved in the deprivation of constitutional rights in order to be liable under Section 1983, personal involvement was never really at issue in this case with respect to Defendants Ortiz and Plantier. The typical case in which a defendant's personal involvement is at issue is where the plaintiff seeks to hold a supervisor liable for the acts of his subordinate. *See, e.g., Baker v. Monroe Twp.*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (reversing dismissal of claim against supervising officer because there was "sufficient evidence to permit an inference that Armstrong knew of and acquiesced in the treatment the Bakers were receiving at the hands of the other officers acting under his supervision"); *Rode*, 845 F.2d at 1208 (affirming dismissal of claims against governor of Pennsylvania where plaintiff did not allege that governor had taken any retaliatory actions and was not otherwise personally involved in retaliation and holding that allegation that governor had responsibility to supervise defendants who engaged in retaliation was irrelevant). Where the superior lacks involvement, a court should dismiss the superior but maintain the action against the individual who deprived the plaintiff of his rights. *See, e.g., Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127-28 (2d Cir. 2004) (superintendent, but not subordinate principal or personnel director, dismissed from action alleging constitutional deprivation of school psychologist's Fourteenth Amendment rights); *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) (affirming jury verdict against police officer charged with constitutional deprivation of woman's

Court found that under a proper application of the law, its proposed instruction was correct, and Defendants could be liable for engaging in conduct that resulted in Plaintiff's termination even if they did not technically make the final decision to terminate Plaintiff. Drawing on the Third Circuit's model jury instructions, the Court ultimately instructed the jury that:

> In order for Mr. Hilburn to recover on this claim against Mr. Ortiz or Mr. Plantier, Mr. Hilburn must prove both of the following by a preponderance of the evidence: First, he must prove that Mr. Ortiz or Mr. Plantier engaged in conduct that resulted in the termination of Mr. Hilburn; and Second, Mr. Hilburn's protected activity – he must prove that his protected activity was a motivating factor in Defendants' decisions to engage in conduct that resulted in the termination of Mr. Hilburn. (11T 161:3-12).

In his post-trial motions, Defendant Ortiz revisits this issue and argues that under the law, if properly applied, he could only have been found liable if Plaintiff proved that he "influenced or participated in the decision to terminate" Plaintiff. In support of this argument, Defendant Ortiz again draws on case law relating to personal involvement, and the Court finds this case law unavailing for the same reasons as at trial. But Defendant Ortiz also raises three new arguments: that the Plaintiff failed to prove a "cat's paw" theory of liability, that Defendant Ortiz lacked the necessary decision-making authority to terminate Plaintiff, and that Defendant's conduct did not constitute an "adverse employment action", i.e., it was not sufficiently deterrent. Ultimately, none of these arguments convinces the Court that its prior construction of the law was incorrect.

Defendant's argument regarding cat's paw liability fails for the same reason as Defendant's argument regarding personal involvement. The Supreme Court discussed the cat's paw theory of liability in its recent opinion in *Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011). Aside from the fact that *Staub* does not involve a Section 1983 claim, it is also not a factually analytical situation: as *Staub* makes clear, the cat's paw theory is about holding an *employer* liable for acts of employment discrimination committed by an *employee* who lacked decision-making authority. *Id.* at 1189 ("We consider the circumstances under which *an employer* may be held liable for employment *discrimination based on the discriminatory animus of an employee* who influenced, but did not make, the ultimate employment decision.") (emphasis added); *see also id.* at 1190 ("The court [of appeals] observed that Staub had brought a 'cat's paw' case, meaning that

---

Fourth and Fourteenth Amendment rights and affirming summary judgment dismissal against police chief and county); *Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997) (affirming entry of summary judgment in favor of prison medical director, but not physicians and guards, charged with violating prisoner's Eighth Amendment right). The Court, in fact, applied this very case law when granting summary judgment for several defendants who were not personally involved with the deprivation of Plaintiff's constitutional rights. ECF No. 62, p. 4-5.

he *sought to hold his employer liable for the animus of a supervisor* who was not charged with making the ultimate employment decision."). Again, in this case, the jury found Defendant Ortiz liable for taking actions which effectuated Plaintiff's termination. If this were a cat's paw case, Plaintiff would be seeking to hold the DOC liable for Defendant's actions. That issue never reached the jury and was not part of the verdict.

Defendant's argument that in order to succeed on an action for retaliation under Section 1983, a plaintiff must demonstrate that the defendant with the retaliatory motive was the same individual who made the decision to terminate the plaintiff's employment, is a variation on the same theme and is similarly incorrect. Again, each of the cases Defendant Ortiz cites only addresses the issue of when an entity or employer can be held liable for the retaliatory acts of its employees. *Walsh v. WalMart Stores, Inc.*, 200 F. App'x 134, 137 (3d Cir. 2006) (affirming dismissal of Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, claims against employer-entity); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 289 (3d Cir. 2001) (reversing dismissal of claims under Title VII, 42 U.S.C. § 2000e, *et seq.*, and state law against employer-entity where plaintiff produced evidence of causation based on actions of his department head and supervisor that occurred after protected activity); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000) (holding that employer may be liable for acts of non-supervisor employee that did not make decision to terminate plaintiff provided non-supervisor employee had influence or leverage over official decision-maker); *Kanafani v. Lucent Tech. Inc.*, No. 07-11, 2009 WL 3055363, at *11-12 (D.N.J. Sept. 18, 2009) (denying defendant's motion for summary judgment on plaintiff's Conscientious Employee Protection Act, N.J.S.A. § 34:19-1 *et seq.*, claim for retaliation against employer-entity where plaintiff had produced some evidence that manager who decided to terminated plaintiff knew of plaintiff's protected activity). These cases do not speak to when another employee can be liable for his own acts of retaliation.

Defendant's third argument, that his conduct did not constitute an adverse employment action, also fails but for slightly different reasons. As noted above, in order to succeed on a retaliation claim under Section 1983 based on deprivation of First Amendment Rights, the plaintiff must prove that the defendant took a retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (discussing elements of claim for retaliation under Section 1983). But as the Third Circuit has noted, the "'deterrence threshold' . . . is very low . . . a cause of action is supplied by all but truly *de minimis* violations."

*O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) (citation omitted). Thus, Defendant Ortiz asks the Court to, post-verdict, rule as a matter of law that Defendant's actions were insufficient to meet the deterrence threshold. This argument suffers from several flaws.

First, whether conduct reaches the deterrence threshold is generally a question of fact to be addressed to the jury, but Defendants did not dispute the issue at trial, and so the Court assumed it to be conceded.[4] Second, Defendant Ortiz fails to explain how termination is sufficient to deter a person of ordinary firmness but how conduct resulting in an individual's termination is not. Regardless of who made the final decision, the end harm to the Plaintiff was his termination. The Court does not see how a jury could reasonably find that Defendant Ortiz successfully schemed to have Plaintiff terminated but that that conduct was somehow "*de minimis*" and thus insufficient to meet the deterrence threshold.[5] And finally, Defendant's construction of the law would require the Court to reach a legal conclusion that is ridiculous on its face. If Defendant Ortiz were correct, an individual who had the power to get a co-worker or subordinate fired but lacked the authority to actually sign off on the termination could never be held liable for retaliation under Section 1983. Every supervisory employee at nearly every major public entity would effectively be insulated from liability for retaliation against his subordinate and co-workers merely because the entity that employs both individuals has some variation of a human resources department. Assuming that Defendant Ortiz lacked the authority to make the final decision to terminate Plaintiff, scheming to have Plaintiff fired was the most severe retaliatory action that Defendant Ortiz was able to take. Under Defendant's proposed interpretation, that conduct – even when it was successful – would not create a cause of action against the actual wrong-doer. The Court finds no support in the case law for such a massive exception to Section 1983 liability, nor does Defendant Ortiz provide any authority for one. Nor can the Court square this interpretation with the overwhelming authority holding that adverse actions much short of termination are sufficient to meet the deterrence threshold. *See, e.g.*, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990) ("[T]he First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as

---

[4] Again, where the parties did not dispute this issue at trial, the trial court need not charge the jury. Model Civ. Jury Instr. 3rd Cir. 7.4 cmt. (2011). The Court notes that Defendants never requested a charge on this element or raised the issue of the element at trial, and so the Court used the model charge, which does not include an instruction on the element. *See id.*

[5] For this reason, even if the Court were to find that it erred by failing to give an instruction on this element – an argument Defendant has not made – the error was harmless because the instruction would not have affected the outcome of the case. *See Advanced Med., Inc. v. Arden Med. Sys., Inc.*, 955 F.2d 188, 199 (3d Cir. 1992).

failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.'"). [6]

### B.  Sufficiency of the Evidence

Defendant Ortiz argues that the evidence at trial was insufficient to support the jury's verdict against him, but Defendant's argument relies heavily on the Court adopting his construction of the law. Now that the Court has rejected that construction, Defendant's argument clearly fails.

At trial, there was more than sufficient evidence from which a jury could reasonably find that Defendant Ortiz engaged in conduct that resulted in Plaintiff's termination and that Defendant Ortiz was motivated in part by Plaintiff's protected activity, including: Plaintiff's testimony regarding the discussion of bid-rigging at morning meetings attended by himself and Defendant Ortiz and his conversations with Defendant Ortiz regarding bid-rigging, (2T 18:15-22:20); Plaintiff's testimony regarding his reporting the bid-rigging to Defendant Ortiz and outside investigators associated with the United States Attorneys Offices for the District of New Jersey, (2T 23:14-24:11; 2T 29:9-31:1; 2T 44:20-46:19; 3T 32:12-40:12); Plaintiff's testimony regarding the change in demeanor exhibited by Defendant Ortiz and changes in Defendant's treatment of Plaintiff after Plaintiff's protected activity, (2T 42:10-43:2; 2T 54:17-55:2; 3T 48:18-50:2); Plaintiff's testimony that Defendant Ortiz threatened him that if he continued to talk about the bid-rigging he would lose his job, (3T 21:3-25); Plaintiff's testimony regarding documents and complaints he filed with the EED regarding Defendant Ortiz, the EED's lack of a response, and his subjective fear that Ortiz was building a file against him that would justify his termination, (3T 84:18-88:10); Plaintiff's testimony that Defendant Ortiz placed Debbie Schoffstall in Plaintiff's office against Plaintiff's wishes and despite the fact that Plaintiff did not feel he had any need for her at the

---

[6] Defendant Ortiz argues alternatively that if conduct short of deciding to terminate is actionable then the statute of limitations bars Plaintiff's Section 1983 claim. But Defendant Ortiz misconstrues the accrual date of Plaintiff's cause of action. Actions brought under Section 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued. *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998); *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989). For Section 1983 actions in New Jersey, "that statute is N.J.S.A. 2A:14-2, which provides that an action for injury to the person caused by wrongful act, neglect, or default, must be convened within two years of accrual of the cause of action." *O'Connor v. City of Newark*, 440 F.3d 125, 126-27 (3d Cir. 2006) (quoting *Brown v. Foley*, 810 F.2d 55, 56 (3d Cir.1987)). A Section 1983 cause of action accrues when the plaintiff "knows or has reason to known of the injury that is the basis of the action." *Reyes v. Sauers*, 453 Fed. App'x. 138, 139 (3d Cir. 2011) (citing *Sameric*, 142 F.3d at 599; *Montgomery v. De Simone,* 159 F.3d 120, 126 (3d Cir.1998)). Plaintiff filed his first complaint on December 21, 2007. The actionable harm here was Plaintiff's termination, and Plaintiff was not terminated until April 2006, well inside the two-year statute of limitations. Even if Defendant Ortiz were to argue that Plaintiff should have known about his impending termination before it happened, the earliest Plaintiff appears to have had any notice of the charges against him that lead to his termination was when he received a letter about an EED investigation in January 2006, also within the limitations period.

time, (3T 97:5-99:20; 3T 105:8-108:10); Plaintiff's testimony regarding the EED's actions against him, which included Plaintiff's suspension for 40 days, (3T 119:5-126:21), and his eventual termination; corroborating testimony from Edward Guz, the Business Manager at the Prison who was present during discussions between Plaintiff and Defendant Ortiz regarding bid-rigging, and Stanley Beet, an investigator from the United States Attorney's Office who met with Plaintiff regarding an investigation into bid-rigging at the Prison; and Ms. Schoffstall's testimony that she felt Defendant Ortiz had used her as an "instrument" to retaliate against Plaintiff, (8T 174:3-174:14), and emails she sent regarding those feelings. This is but a cursory summary of the evidence at trial. Plaintiff also introduced a multitude of corroborating documents, including EED documents and letters from DOC personnel to Plaintiff that would have supported such a finding. The jury could even have reasonably and fairly drawn inferences from the testimony of Defendant Ortiz and other defense witnesses, such as Kenneth Green, then the Acting Director of the EED, that would support its finding of liability, depending on how the jury assessed the credibility of each witness's testimony.

This same evidence was also sufficient for the jury's implicit decision to reject Defendant's affirmative defense based on the Supreme Court's decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).[7] Defendants did produce evidence at trial from which a reasonable jury could have concluded that both Defendants proved they were entitled to the *Mt. Healthy* defense, as Defendant Ortiz outlines in his post-trial briefs. But, again, it is not for the Court to choose which application of the facts is the correct one or to substitute its own conclusions for those of the jury. *See Fowler*, 578 F.3d at 213 n.8

Because the evidence was sufficient for the jury's verdict, the Court must reject Defendant's motion.

## III.   Motion for a New Trial Pursuant to Fed. R. Civ. P. 59(a)

### A. Standard

Pursuant to Rule 59(a)(1)(A): "The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law

---

[7] In *Mt. Healthy*, the Supreme Court ruled that once the plaintiff has carried his burden of proving that he was retaliated against, the finder of fact must consider whether the defendant has proved by a preponderance of the evidence that he would have taken the same action against the plaintiff even absent the plaintiff's protected activity. *Id.* at 287. If the defendant carries its burden, it is a complete defense to liability. *Id.*

in federal court." The exact standard for granting a new trial depends on the nature of the alleged error. But in any event, the Court may not grant a new trial for harmless errors, pursuant to Federal Rule of Civil Procedure 61:

> Unless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

*See also Vandenbraak v. Alfieri*, 209 F. App'x 185, 188-89 (3d Cir. 2006).

Defendant Ortiz raises a number of reasons he claims that a new trial is warranted. The Court will address each in turn.

### B. Based on Errors in the Jury Instructions and Verdict Form

Defendant Ortiz argues that the Court made several crucial errors in its jury charge and on the accompanying verdict form that necessitate a new trial. The Court has reviewed both the charge and the verdict form and finds that it committed no error.

When a jury instruction is erroneous, a new trial is warranted unless such error is harmless. *See Advanced Med.,* 955 F.2d at 199. An error is harmless if it is "highly probable" that the error did not contribute to the judgment. *Id.* An erroneous jury instruction may also be considered non-fundamental when, taking the instructions as a whole, the erroneous instruction is a "solitary misstatement of law" buried in an otherwise correct legal explanation. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 137 (3d Cir. 1997).

Defendant Ortiz claims the Court erred by failing to properly instruct the jury regarding the availability of the *Mt. Healthy* defense. Defendants are incorrect, as comparison of the Court's instruction to the Third Circuit's model charge makes clear. The model charge, § 7.4, regarding the *Mt. Healthy* defense, states:

> However, [defendant] argues that [he/she] would have made the same decision to [describe adverse action] whether or not [plaintiff] had engaged in the protected activity. If [defendant] proves by a preponderance of the evidence that [defendant] would have treated [plaintiff] the same even if [plaintiff's] protected activity had played no role in the employment decision, then your verdict must be for [defendant] on this claim.]

At trial, the Court gave an instruction that mapped the model charge:

> However, Mr. Ortiz . . . and/or Mr. Plantier argue that they would have engaged in the same conduct that resulted in Mr. Hilburn's termination whether or not Mr. Hilburn had engaged in the protected activity. If either Defendant proves by a preponderance of the evidence that he would have

treated Mr. Hilburn the same even if Mr. Hilburn's protected activity had
played no role in the employment decision, then your verdict must be for
that Defendant on this claim.

(4T 162:4-12). The Court's instruction was thus not in error.

Nor did the Court err by failing to include a specific interrogatory in the jury
verdict form relating to the *Mt. Healthy* defense or mitigation of damages. It is
well-settled law that Federal Rule of Civil Procedure 49 "places the matter of
submitting interrogatories to the jury entirely within the discretion of the trial
judge." *Moyer v. Aetna Life Ins. Co.*, 126 F.2d 141, 145 (3d Cir. 1941); *Allstate
Ins. Co. v. Hrin*, No. 05-158, 2006 WL 2540778, at *5 (E.D. Pa. Aug. 31, 2006).
Generally, the failure to include an affirmative defense on a verdict form is not an
abuse of discretion where the form, read in light of the jury instructions, informed
the jury that in finding the defendant liable they were implicitly rejecting the
affirmative defense. *See Moyer*, 126 F.2d at 145; *see also E.E.O.C. v. Mgmt.
Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (finding no error
where trial court failed to include interrogatory regarding affirmative defense on
verdict form); *Fuller v. Fiber Glass Sys., LP*, 618 F.3d 858, 867 (8th Cir. 2010)
(same); *Advanced Bodycare Solutions, LLC v. Thione Intern., Inc.*, 615 F.3d 1352,
1362 n.22 (11th Cir. 2010) (finding no error where trial court did not include
interrogatory on mitigation of damages); *Shapiro v. Kelly*, 141 F.3d 1163, 1998
WL 197793, at *6-7 (5th Cir. 1998) (table) (same). Here, because the Court
properly instructed the jury regarding the *Mt. Healthy* defense, as discussed above,
and mitigation, *see* (11T 164:7-18), the jury could not have found Defendant Ortiz
liable without implicitly rejecting the *Mt. Healthy* defense nor could the jury have
awarded compensatory damages without properly considering the issue of
mitigation. For these reasons, the Court's refusal to include specific interrogatories
on these issues was not erroneous.[8]

### C. Based on the Jury Verdict Being Against the Weight of the Evidence

Defendant Ortiz argues that he is entitled to a new trial because the jury's
verdict was against the weight of the evidence. The Court disagrees.

"[A] district court ought to grant a new trial on the basis that the verdict was
against the weight of the evidence only where a miscarriage of justice would result
if the verdict were to stand." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344,
1352 (3d Cir. 1991) (citation omitted). A new trial may also be appropriate where

---

[8] Defendant also argues that it is entitled to a new trial because the Court erred by instructing the jury that it could
find against Defendant if Plaintiff proved by a preponderance of the evidence that Defendant "engaged in conduct
that resulted in" Plaintiff's termination instead of proving that Defendant "influenced or participated in the decision"
to terminate Plaintiff. The Court addressed the legal basis of this argument in Part II, *supra*, and its analysis applies
equally here. Because the Court properly construed the relevant law, its jury charge was not in error.

"the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* at 1353. The Third Circuit has recognized that in so ruling the district court runs the risk of substituting its judgment for the judgment of the jury, and thus the district court's freedom to make such a substitution varies with the complexity of the case. *Id.* at 1352. "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations such as passing upon the nature of an alleged newly discovered organic compound in an infringement action." *Id.* (quotation omitted).

Defendant's arguments in support of its motion on this point are variations of its prior arguments for judgment as a matter of law which the Court has already rejected: (1) there was no evidence that Defendant Ortiz participated in or influenced the decision to terminate Plaintiff; and (2) the evidence establishes that Plaintiff would have been terminated regardless. The jury found otherwise and had a sufficient evidentiary basis for doing so, as the Court discussed above. Defendant Ortiz does not explain how this verdict is so against the weight of the evidence as to shock the conscience or result in a miscarriage of justice, nor does the jury's verdict shock the conscience. Defendant Ortiz had the opportunity to present his version of the facts at trial and defense counsel vigorously presented his case with competence and thoroughness. That the jury rejected his arguments does not mean that there was a miscarriage of justice. The facts of the case were relatively straightforward and did not require the jury to understand complicated technical information. That Defendant Ortiz was able to put forth evidence that was refuted some of the evidence proffered by Plaintiff is not a basis for relief where a reasonable juror could have interpreted the evidence as supporting either party's case. *See id.* at 1354 (reversing trial court's decision to grant new trial based on defendant's presentation of evidence contradictory to plaintiffs).

### D. Based on the Court's Examination of Witnesses

Defendant Ortiz also argues that it is entitled to a new trial because the Court improperly examined witnesses resulting in unfair prejudice. In support of its argument, Defendant Ortiz cites a number of instances from the trial transcripts where the Court asks what Defendant Ortiz believes to be improper or unfair questions. The Court has reviewed these citations – and the transcripts as a whole – and finds that it has committed no error.

"In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469 (1933). As the Third Circuit has recognized, "[a] trial is not a contest but a search for the

12

truth so that justice may properly be administered." *United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1983) (quoting *Riley v. Goodman*, 315 F.3d 232, 234 (3d Cir. 1963)). "For the purpose of eliciting the germane facts, a judge may on his own initiative and within his sound discretion interrogate witnesses." *Id.*; *see also* Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."). "This has been an important and longstanding practice on the part of trial judges and should not be discouraged." *Chainey v. Street*, 523 F.3d 200, 221 (3d Cir. 2008). "The manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule." Fed. R. Evid. 614 cmt sub. (b). But a trial court must use this power judiciously and must not abandon its proper role and assume that of an advocate. *Beaty*, 722 F.2d at 1093 (citing *United States v. Green*, 544 F.2d 138, 147 (3d Cir. 1976)). The ultimate question is whether the trial court's conduct was so prejudicial as to deprive a party of a fair – as opposed to perfect – trial. *Id.* (citing *United States v. Parodi*, 703 F.2d 768, 776 (4th Cir. 1983)).

Review of the transcripts of the proceedings illustrates that while the Court exercised its power to examine witnesses, it did not do so in a way that so prejudiced Defendant Ortiz as to deprive him of a fair trial. Here, Defendant Ortiz cites a number of instances in which he claims the Court improperly exercised its power to examine witnesses and thus prejudiced the jury against him. But Defendant Ortiz does not make specific arguments regarding those instances or explain with particularity how those instances prejudiced him; instead, Defendant Ortiz argues generally that the Court's examination unfairly emphasized testimony favorable to Plaintiff and elicited testimony damaging to Defendant. But the Court finds only that it asked questions for the proper purpose of clarifying answers. In none of the instances cited did the Court improperly pass on a witness's testimony or credibility or ask any questions that were unfairly suggestive or damaging. Nor did defense counsel ever object to the Court's questioning of witnesses, which it could have done at the time of the question or outside of the presence of the jury, pursuant to Federal Rule of Evidence 614(c). The Court also notes that it also frequently examined witnesses and asked question it felt were necessary to clarify testimony during examination by Plaintiff's counsel.

Finally, the Court notes that it instructed the jury several times that it was not to give the Court's questions any additional weight and that the jury itself was the sole and final determiner of the facts and evidence, including during its final jury charge:

> If, during the course of the trial, I ask [sic] questions of any witnesses, it was solely for the purpose of making clear whatever the testimony was from a witness or perhaps clarifying a question for the witness' benefit.

13

> You are not to infer from the fact that I asked some questions here and there
> that I hold any opinion whatsoever regarding the result of this trial; in fact,
> I do not. Nor should you consider it any more or any less important because
> a question happened to be asked by me rather than by one of the other
> attorneys.

(11T 150:16-24); *see also* (3T 129:6-13; 7T 45:17-23). These instructions
mitigated any potential for prejudice.

### E.   Based on Allegations that the Court "Chastised" or "Criticized" Defense Counsel in the Presence of the Jury

Defendant Ortiz argues that the Court frequently criticized and chastised
defense counsel in front of the jury, thereby causing such prejudice that a new trial
is warranted. The Court has reviewed Defendant's arguments and the trial
transcripts and disagrees. Counsel for both parties pushed the limits of proper
courtroom conduct. While the Court would have preferred to have had less
involvement in the proceedings, it did no more than was necessary to ensure that
counsel for both parties conducted themselves properly and with professionalism.

A "trial judge is entrusted with wide discretion in matters relating to the
conduct of counsel during trial." *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d
Cir. 2005). While "[t]he role of a trial judge should not be akin to that of
schoolyard supervisor", *id.* 352 n.5, the conduct of attorneys will sometimes
compel a judge's intercession. The Court "should exercise reasonable control over
the mode and order of examining witnesses and presenting evidence so as to: (1)
make those procedures effective for determining the truth; [and] (2) avoid wasting
time." Fed. R. Evid. 611(a). The Court must also guard against improper
questioning, such as, for example, unnecessary or inappropriate leading questions.
*See* Fed. R. Evid. 611(c); *Fattman v. Bear*, 349 F. App'x 956, 958 (3d Cir. 2007).

Here, counsel for both Plaintiff and Defendants engaged in zealous
advocacy, requiring the Court to, at times, step in to prevent counsels' conduct
from crossing the line between spirited representation and improper conduct. *See
Berger v. Zeghibe*, 465 F. App'x 174, 183 (3d Cir. 2012) (refusing to find district
court erred and holding that "[t]he majority of the contested comments by the
District Court were directed towards Weinstein's counsel – not Weinstein himself
– and were responses to counsel's efforts to press beyond bounds the Court had
set."). The record is replete with instances in which counsel for both parties
conducted themselves in such a manner as to compel the Court to step in to restore
the decorum of the courtroom, to prevent improper questioning or testimony, or to
enforce some control over the proceedings. Whenever possible, the Court took
action outside the presence of the jury. (2T 26:6-10; 8T 51:8-15; 8T 97:13-18). But
because of the sheer number of instances of this conduct, that was not always

14

possible.

The instances of claimed "criticism" are not in actuality criticism at all, but merely incidents where counsel's conduct compelled the Court to act. Many of these incidents occurred because defense counsel asked leading or otherwise improper questions on direct and redirect that compelled the Court to step in to prevent further questioning or to sustain Plaintiff's counsel's objections, (3T 201:13-20; 6T 89:23-24; 8T 71:6-72:4; 8T 77:13-78:6; 9T 144:21-25; 10T165:23-166:2; 10T 205:9-10), and, in at least one instance, to instruct the jury to prevent error. (4T 34:3-16). The vast remainder of these incidents involve the Court preventing defense counsel from improperly commenting on evidence or testimony, (9T 116:12-22), improperly reading deposition transcripts with suggestive voice inflections, (11T 308:24-309:4), or openly expressing disapproval of the Court's rulings in front of the jury by commenting on issues already discussed at sidebar. (7T 168:21-24) ("MS. KELSEY: I can't inform this jury what he considered? THE COURT: No. Don't do that in front of this jury because I just told you at sidebar, Ms. Kelsey, no."). In one instance of claimed criticism, the Court simply advised defense counsel in front of the jury not to shake her head or make unnecessary facial expressions, (7T 170:1-3), but the Court did so only after warning counsel outside the presence of the jury regarding the same conduct. (6T 165:15-24; 6T 172:21-173:12). In the few other citations Defendant Ortiz provided, the alleged "criticism" was nothing more than the Court gently prodding defense counsel to proceed more quickly during unnecessary pauses in questioning, (3T 199:22-24), or limiting the excessive reading of documents that were in evidence and the contents of which the witnesses were capable of testifying about. (6T 90:18-91:4, 6T 96:14-97:5). A new trial is not merited simply because the Court advised defense counsel on occasion that her questions were "inappropriate", *see, e.g.* (10T 165:23-166:2), sustained proper objections by opposing counsel, or made evidentiary rulings that defense counsel did not like. And, in any event, the Court instructed the jury to disregard objections and the Court's rulings on objections:

> "I also ask you to draw no inference from the fact that on occasion I ruled on the admissibility of certain evidence or the inadmissibility of certain evidence. The rulings that I've made during the trial are not any indication of my views of what your decision should be as to the facts of this case. You are to draw no inferences from any objections made by counsel or from my rulings on those objections."

(11T 149:21-150:2).

And if Defendant's concern here is bias, the Court notes that its comments at trial cut both ways thereby mitigating any influence on the jury for or against either

15

party. Actions by Plaintiff's counsel drew identical reactions from the Court. For example, the Court prodded Plaintiff's counsel to proceed more quickly on several occasions, (6T 244:8-13; 6T 245:6-7; 10T 75:5-7), stopped Plaintiff's counsel from wasting the jury's time by asking questions that would result in cumulative testimony, (10T 73:24-74:2), and warned Plaintiff and Plaintiff's counsel numerous times in front of the jury not to testify improperly or to asked improper questions, respectively. (2T 5:16-20; 2T 6:1-14; 2T 15:14-16:2; 2T 17:4-12; 2T 24:20-25:2; 2T 45:7-16; 3T 113:13-19). The Court even informed Plaintiff's counsel, in front of the jury, that certain questions were not "appropriate". (4T 144:8-16). These citations are but a sample of instances where the Court leveled similar "criticism" against Plaintiff and Plaintiff's counsel.

　　While the Court would prefer to proceed without being forced to make such statements, the Court did not err in its actions and a new trial is not warranted.

　　F.　Based on Allegations that the Court Improperly Commented on Evidence

　　Defendant Ortiz claims that the Court also improperly commented on evidence and witnesses during trial. Defendant Ortiz cites two specific instances of this conduct that occurred in front of the jury and one that occurred at sidebar. The Court has reviewed all three and finds no error meriting a new trial.

　　"Any comment by a trial judge concerning the evidence or witnesses may influence a jury considerably, and emphatic or overbearing remarks . . . may be accepted as controlling," *United States v. Anton*, 597 F.2d 371, 374 (3d Cir.1979). The Third Circuit has set forth a series of factors to consider in determining whether a trial court's remarks "are appropriate" or, instead, whether they would "unduly influence a jury," *United States v. Olgin*, 745 F.2d 263, 268 (3d Cir.1984). Those factors include "the materiality of the comment, its emphatic or overbearing nature, the efficacy of any curative instruction, and the prejudicial effect of the comment in light of the jury instruction as a whole." *Id.* at 268-69. Jurors are, after all, presumed to follow a court's instructions, *see United States v. Vaulin*, 132 F.3d 898, 901 (3d Cir.1997), and an instruction explaining that the jury is "free to disregard [the court's] remarks and . . . determine the facts . . . on its own" may therefore counterbalance a potentially prejudicial comment. *Olgin*, 745 F.2d at 269.

　　Neither of the incidents that occurred in front of the jury actually involved the Court commenting on evidence or credibility, and even if they could be so construed, neither was so material as to support a finding of prejudice. The first incident occurred during cross-examination of Defendant Plantier. The Court merely ruled that a particular area of questioning was appropriate on cross-

examination after vigorous objection from defense counsel:

> MS. KELSEY: Judge, again, this is way beyond the scope of direct, and he already indicated as a basis that –
>
> THE COURT: It's not beyond the scope of direct. It's not.
>
> MS. KELSEY: Judge, he already said he has no knowledge whatsoever about the facts in that case.
>
> THE COURT: He's allowed – it's cross-examination. He's allowed to probe and see how much, if any, knowledge he has. Just because he says he has no knowledge, that may be the case. But certainly one of the roles of cross-examination is to ask and see what, if any, knowledge he had about – or understandings he had about any of this situation.

(7T 235:9-20). Even if the Court were to construe the Court's ruling as a comment on Defendant Plantier's credibility, it is hard to see how this exchange negatively affected the jury's feelings regarding his credibility – after all, the jury rendered a verdict in Defendant Plantier's favor, implying that they credited his testimony at least in part. The Court also mitigated any potential prejudice by instructing the jury that objections and the Court's rulings on objections are not evidence and are not to be considered in any weigh in rendering a verdict. (11T 149:21-150:2).

The second incident occurred during the direct examination of Mr. Green. The Court asked a clarifying question to determine whether Mr. Green was testifying that a particular course of action was justified a matter of his opinion or was required as a matter of written DOC policy, where defense counsel's question was somewhat ambiguous:

> MS. KELSEY: I would like you to turn to the bottom of page 2 where you discuss the penalty part of your determination, and could you please read that to the jury?
>
> A: (Reading) The minimum penalty for a supervisor on the third offense is removal. Moreover, the conduct uncovered constitutes multiple occurrences of aggregating circumstances related to an evaluation of the conduct. These are not de minimus violations, and neither Mr. Hilburn nor his attorney have offered any mitigating evidence. Accordingly, given the gravity of the offenses, removal is the appropriate penalty.
>
> . . .
>
> Q: Mr. Green, even if this was not the third violation, would what you heard on the tape and what you considered in connection with your determination have been sufficient for removal even if this had been the first violation?
>
> A: Yes, ma'am, given his status as a supervisor, given the smorgasbord of racial and sexual statements made to protected categories in an off-site trailer and threats of how things were done, the totality of the circumstances would have required a removal for the first offense, let alone the third.

THE COURT: That would have been your opinion?
THE WITNESS: Yes. I'm sorry, yes, sir.
THE COURT: It's based on your opinion?
THE WITNESS: Yes, sir.

(10T 187:14-188-1). The distinction was important: Defendants based their defense in part on their argument that DOC policy clearly required Plaintiff's termination because his use of racist and sexual language constituted a "third strike." And in light of the Court's power to examine witnesses, as discussed above, the question was proper. Again, the Court mitigated any prejudice by properly instructing the jury that the Court had no opinion regarding the case and the evidence, and that the Jury was not to give any weight to questions asked by the Court. (3T 129:6-13; 7T 45:17-23; 11T 150:16-24).

The third instance involves an evidentiary ruling the Court made during a sidebar conference. Counsel and the Court engaged in a discussion about the admissibility of evidence that certain individuals at the DOC had been indicted and convicted for bid-rigging crimes that Plaintiff complained about as part of his protected activity. (3T 157:6-160:19). Defense counsel objected and argued that the information was irrelevant and otherwise unfairly prejudicial. The Court disagreed and found that the information was relevant and allowed limited testimony on the issue. In so ruling, the Court noted:

> [N]ow that I've seen some of these documents, if the jury believes him, he's referring to bid-rigging in some of these supplemental complaints. He might not have brought it out first because I think it's pretty reasonable, he might have been concerned about bringing it out on paper, you know, he's in the "hen house" with all these people. You know what I'm saying? And he's the one blowing the whistle, that's why this statute is there, by the way. This statute is there to protect people like this, you know? This whole cause of action is intended – it's not easy for somebody in a government agency to blow the whistle on the agency. Of course there's fear, if I do this I could lose my job, et cetera. You know, that's what this case is all about. All right [sic]. I'm going to let it in because it's coming in anyhow.

(3T 160:9-15). The following day outside of the presence of the jury, defense counsel put on the record that an attorney from the DOC who was observing the trial on the previous day, overheard what she believed to be favorable comments the Court made during that sidebar conference (4T 125:10-20). Although defense counsel did not identify on the record the specific comments the attorney claimed to have overheard, Defendant Ortiz identified the above-quoted statement in his post-trial motions

But as the Court noted on the record, there was no indication that the jury itself overheard this statement: the DOC attorney was seated right behind defense

counsel's table, on the opposite of the courtroom as the jury, and much closer to the sidebar conference than the jury was. (4T 126:1-127:16). When the jury re-entered the courtroom after being apprised of defense counsel's concern, the Court immediately instructed the jury that they were to disregard any comments they may have overheard at sidebar, (4T 130:11-131:4), and the Court gave a similar instruction at the end of the trial. (11T 154:14-21). Even if the jury had heard the comment, this instruction should have been sufficient to mitigate any undue prejudice. *See, e.g.*, *United States v. Johnson*, 247 F. App'x 357, 363 (3d Cir. 2007) (holding no error where no indication that jury overheard district judge's sidebar comments and court properly instructed jury that comments he made to lawyers were not evidence and that he had no opinion of case); *see also Olgin*, 745 F.2d at 269.[9]

Defendant Ortiz has produced no authority supporting the grant of a new trial based on this comment. The one case Defendant Ortiz cites, *United States v. Gaines*, 450 F.2d 186 (3d Cir. 1971), actually suggests that the Court should *not* order a new trial. In *Gaines*, the district court explicitly commented on the evidence and testimony to the jury during the jury charge, noting that it was "more cumulative" against one defendant than another, and openly questioning the merit of one defendant's defense:

> He testified that he just happened to be around that corner that day when all of a sudden his brother and three other men came running out of this bank and said, "Come on, Reginald," and he hops into the truck. Now, can you believe that or is this another coincidence? You determine in your own mind whether there is any substance to his defense whatever.

*Id.* at 188-89. The defendant was ultimately convicted. *Id.* at 188. On appeal, the Third Circuit found that no reversible error had occurred, noting that "a federal judge is not required to refrain from expressions of opinions during his charge to the jury," and holding that the jury charge, in its totality, made clear the jury remained the sole determiner of credibility and fact. *Id.* at 189.

If this highly suggestive comment from *Gaines* – directly made to the jury at a criminal trial – is insufficient to support a finding of error, then the Court does not see how its much more innocuous comment to counsel at sidebar requires a new trial, even if the jury were to have overheard it. The Court's comment was not so emphatic as to overpower the jury and was not as material as the trial court's comments in *Gaines.* The Court's comment, though somewhat inelegantly phrased,

---

[9] Defendant also argues that the Court erred by failing to poll the jury as to whether they overheard the statement in question, but Defendant does not cite any authority for the assertion that the Court had an affirmative duty to poll the jury in addition to giving a curative instruction. In absence of such authority, the Court finds this argument unpersuasive.

went more to the policy implications of Section 1983 than to the particular merit of Plaintiff's case. And, as in *Gaines*, the Court's instruction to disregard comments and sidebar and the Court's instruction that it had no opinion on the case were sufficient to mitigate any prejudice that may have occurred.

### G. Based on Cumulative Errors in Admitting and Excluding Evidence

Defendant Ortiz cites a number of evidentiary rulings he claims were so substantial as to warrant a new trial. The Court has reviewed the rulings and finds that each was either not in error or, if it was, the error was harmless.[10]

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. As such, "evidence is irrelevant only when it has no tendency to prove the fact." *Spain v. Gallegos*, 26 F.3d 439, 452 (3d Cir.1994). Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Evidence that is relevant may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Hearsay evidence is not ordinarily admissible even when relevant. Fed. R. Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Goodman v. Pennsylvania Turnpike Com'n*, 293 F.3d 655, 666 (3d Cir. 2002). The Third Circuit has held that "[t]wo of the basic reasons for excluding hearsay evidence are that it violates the rules that all testimony must be given under oath and that the opposing party is to be given an opportunity to cross-examine the person making the statement." *Rossville Salvage Corp. v. S. E. Graham Co.*, 319 F.2d 391, 396 n. 5 (3d Cir. 1963). A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear its substance. *Goodman*, 293 F.3d at 667.

Defendant Ortiz has organized the rulings it considers erroneous into a series of categories, and the Court will address each category in turn.

### i.   Admitting Testimony of Edward Guz Regarding Retaliation

Defendant Ortiz alleges that the Court repeatedly erred by allowing Mr. Guz to testify that he was retaliated against. The Court has reviewed these rulings and

---

[10] Defendant argues that even if the evidentiary rulings were harmless errors individually, the cumulative effect of the evidentiary errors is so great as to warrant a new trial. But the Third Circuit has rejected application of the cumulative error doctrine in civil trials. *See U.S. S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 196 (3d Cir. 2000). Even if the doctrine did apply, a new trial would not be warranted on this record.

finds no error that would warrant a new trial.

Defendant Ortiz points to two particular areas of Mr. Guz's testimony. In the first, Defendant Ortiz cites to a portion of Mr. Guz's testimony that Defendant Ortiz characterizes as the Court allowing Mr. Guz to testify that he was retaliated against for reporting the alleged bid-rigging. But review of this portion illustrates that, in fact, the Court permitted Mr. Guz to testify as to some general background information regarding his employment and specifically acted to prevent Mr. Guz from testifying that he was retaliated against. (4T 141:10-143:2). Mr. Guz testified that he selected his specific retirement date, in part, because of the "circumstances" in which he found himself and that his choice of date was "connected" to the bid-rigging. (4T 142:25-143:13). The Court properly admitted this information to provide helpful context for Mr. Guz's overall testimony, *see, e.g.*, *United States v. Holmes*, 413 F.3d 770, 773 (8th Cir. 2005) (holding testimony was relevant "because it provided background and contextual information that would have been useful in assessing the relative credibility" of witnesses and parties), and the Court properly instructed the jury that whether Mr. Guz was retaliated against was not an issue at trial they were to consider and that the testimony was merely admitted as relevant background information. (4T 142:7-11). In the second disputed portion, the Court permitted Plaintiff's counsel to ask Mr. Guz whether anyone other than Defendant Ortiz had threatened his job. (4T 158:9-159:2). The question came in apparent response to defense counsel's question during cross-examination whether Defendant Ortiz had threatened Mr. Guz's job. (4T 157:5-12). In light of defense counsel's question, this was a fair line of inquiry, as an individual other than Defendant Ortiz but who may have had some connection to Defendant Ortiz could have threatened Mr. Guz. Testimony regarding that issue would have been relevant in rebutting Defendants' argument that Defendants' apparent lack of retaliation against Mr. Guz suggested that they also had not retaliated against Plaintiff. Once it became clear to the Court that although an individual had threatened Mr. Guz the individual had no connection to Defendants, the Court prevented further questioning. (4T 159:2-14).

Even if the Court were to find that any of its rulings in these two portions of Mr. Guz's testimony were in error, the error would be harmless because Defendant has failed to demonstrate how this testimony could have substantially affected the outcome of the case. As the record shows, Mr. Guz also testified that neither of Defendants threatened his job in any way. (4T 154:2-10). And Mr. Guz further testified that he was friendly with both Defendants. (4T 157:5-20). Defense counsel dealt skillfully and thoroughly with Mr. Guz's testimony in her closing argument and used the disparity in Defendant's treatment of Mr. Guz and Plaintiff to attack Plaintiff's credibility. (11T 39:23-46:11). Thus, it is seems highly

probable that in any event the jury would not have imputed any retaliatory motive held by other DOC personnel to Defendants.

ii.   Admitting Evidence Regarding Debbie Shoffstall's Character

Defendant Ortiz also argues that the Court improperly permitted Plaintiff to introduce character evidence regarding witness Debbie Schoffstall in violation of Federal Rules of Evidence 403 and 404. The Court disagrees.

Under Federal Rule of Evidence 404(a)(1), "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(b)(1) similarly, prohibits "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But Rule 404(b)(2) provides that other act evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b) is a rule of general admissibility – that is, it is an inclusionary rule subject to the single exception of propensity. *United States v. Green*, 617 F.3d 233, 244 (3d Cir. 2010). Other acts evidence may be admissible for any non-propensity purpose. *Green*, 617 F.3d at 244. "To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." *Id.* at 249.

The particular evidentiary rulings regarding Ms. Schoffstall to which Defendant Ortiz objects fall into two categories. The first involves what Defendant Ortiz claims is evidence that was offered to prove Ms. Schoffstall was a serial litigant. The Court notes that neither subsection of Rule 404 barred the Court from admitting the limited evidence that Defendant Ortiz now complains of because none of the evidence the Court admitted went to propensity. Defendants did not dispute that Ms. Schoffstall complained to Defendant Ortiz regarding Plaintiff's conduct – in fact, Defendants' relied heavily on the fact that Ms. Schoffstall did so in making the argument that Plaintiff was terminated for a reason unrelated to his protected activity. Ms. Schoffstall testified that she went directly to Defendant Ortiz and complained of Plaintiff's conduct, and Defendant Ortiz's testimony corroborated that fact. Thus, no evidence was even offered with the attempt of proving that Ms. Schoffstall acted in conformity with her character of filing complaints or lawsuits when she felt she had been harassed or discriminated

against.[11]

And while the Court is mindful of the general risk of prejudice posed by charges of litigiousness, *see, e.g.*, *Outley v. City of New York*, 837 F.2d 587, 592-95 (2d Cir. 1988) (holding that admission of evidence of prior lawsuits likely deprived plaintiff of fair hearing on his claims), the Court does not believe the prejudice here substantially outweighed the probative value of the evidence. Ms. Schoffstall was not a litigant, nor was the evidence admitted to undermine her credibility. And the jury could not reasonably doubt the veracity of her claims regarding Plaintiff's language, because the jury heard the recordings. By contrast, in *Outley*, "[a]n important part of the City's overall defense was to undermine Outley's credibility by, inter alia, portraying him as a chronic litigant." *Id.* at 592. That is, the evidence in *Outley* was admitted to show that the plaintiff's claims were not credible because he had a history of filing nuisance lawsuits. *Id.* at 592-93. Nothing similar happened here, as review of the rulings at issue shows.

The Court allowed Plaintiff's counsel to narrowly question Plaintiff regarding Plaintiff's subjective reasons for not wanting Ms. Schoffstall to be assigned to his office; i.e., that he was concerned she would file an EED complaint against him based on her past history of filing such complaints. (3T 105:15-21). The purpose of that testimony was not character evidence regarding Ms. Schoffstall's reputation, but to show Plaintiff's state of mind and explain why he specifically objected to the idea of having Ms. Schoffstall assigned to him. (3T 101:4-13). This issue was not just relevant, but crucial to Plaintiff case, which rested in part on proving that Defendant Ortiz specifically assigned Ms. Schoffstall to Plaintiff without Plaintiff's request or input as part of his scheme to retaliate against Plaintiff for his protected activities.

The Court also permitted Plaintiff to procure limited testimony regarding Ms. Schoffstall's prior relationship with Mr. Ortiz, which included how Ms. Schoffstall first came to be working with Mr. Ortiz and why Ms. Schoffstall left Mr. Ortiz's office. (7T 41:13-49:8; 9T 145:6-146:22). But the Court prohibited further testimony in the area, including Plaintiff's attempts to procure testimony regarding Ms. Schoffstall's alleged history as a personal escort. (9T 145:25-146:2; 147:1-16). The testimony the Court admitted was permissible background information and was also relevant to Plaintiff's allegations that Mr. Ortiz and Ms. Schoffstall had a prior history, which could help explain why Mr. Ortiz used Ms. Schoffstall as part of his scheme to retaliate against Plaintiff. (7T 33:11-40:14). The Court also allowed Mr. Guz to testify regarding the circumstances surrounding

---

[11] The Court also notes that Defendant Ortiz does not argue that the Court somehow erred by failing to give a Rule 404(b) limiting instruction regarding use of other act evidence; indeed, Defendant Ortiz does not cite to any instance in the proceedings where defense counsel made such a request.

23

Ms. Schoffstall's departure from his office, which, again was relevant background evidence. (4T 111:13-112:7).

The Court also permitted Plaintiff's counsel to procure from Ms. Schoffstall very limited testimony regarding other EED complaints she filed, (10T 69:23-71:4), but the relevance of that testimony was not based on Ms. Schoffstall's character. Instead, that testimony was relevant to show that Ms. Schoffstall understood the normal process for filing internal EED complaints (10T 71:11-21). This was relevant to Plaintiff's case, because Ms. Schoffstall testified that instead of going directly to the EED office with her complaint, she went to Defendant Ortiz. (9T 14:20-16:11). Plaintiff properly used this testimony as part of his argument that the tape recordings were part of a scheme by Defendant Ortiz to retaliate against Plaintiff and that Ms. Schoffstall participated in the scheme.

The second category of rulings involves evidence regarding Ms. Schoffstall's sensitivity. The Court allowed, over Defendants' objection, Plaintiff's testimony that Ms. Schoffstall "had a mouth like a trucker", which came in response to a line of questioning regarding whether Ms. Schoffstall had ever given Plaintiff any indication that he found his off-color comments, sexually explicit language, or racist jokes offensive. (3T 112:17-113:3). The Court also permitted Plaintiff to cross-examine Ms. Schoffstall in a limited fashion regarding an EED complaint filed against her by another DOC employee alleging that Ms. Schoffstall had made racially or culturally insensitive remarks that Ms. Albana – a muslim – was offended by. (9T 67:22- 69:17). All of this testimony went directly to Ms. Schoffstall's credibility as a witness – she testified that she recorded Plaintiff's conversations because she was offended by his racist and sexist comments. A reasonable juror could infer from her own use of racially insensitive language that she was not in actuality offended by Plaintiff's language and thus had some other motive for recording Plaintiff. The evidence was therefore probative of whether Ms. Schoffstall was a willing participant in Defendant Ortiz's scheme to retaliate against Plaintiff.

In sum, the Court finds no errors relating to evidence regarding Ms. Schoffstall that would justify a new trial.[12]

### iii.   Excluding Evidence Regarding Delores Green

Defendant Ortiz argues that the Court erred by excluding evidence of statements made by Plaintiff's secretary, Delores Green, deceased, regarding

---

[12] The Court also notes that in at least two instances where Defendant claims that the Court admitted improper testimony over Defendants' objections, the citations provided by Defendant actually refer to portions of the transcript where the Court sustained Defendants' objections and refused to allow Plaintiff's counsel to question the witness regarding these issues. (6T 284:15-285:8).

Plaintiff's violations of DOC policy. While the Court did admit some testimony that statements given by Ms. Green played a part in the EED's investigation and Defendant Ortiz's decision to report Plaintiff's conduct to the EED, (6T186:9-187:3; 10T 105:25-106:17), and that Ms. Green encouraged Ms. Schoffstall to record Plaintiff (9T 12:23-13:1), the Court excluded other evidence on the grounds that it was hearsay and for other reasons. In so ruling, the Court did not err.

Defendant Ortiz first claims the Court erred by excluding from evidence a civil complaint filed by Ms. Green against the DOC and various other individuals, including Plaintiff, in state court. (4T 17:18-18:23). In actuality, defense counsel withdrew the exhibit after a colloquy with the Court regarding the exhibit's admissibility. (4T 27:12-13). But even if this constituted a *de facto* exclusion – the Court was, admittedly, quite frank that it was leaning towards ruling that the evidence was inadmissible – the Court did not err because the complaint contained numerous hearsay statements and was drafted by an individual other than Ms. Green. Defendants claimed the complaint impeached Plaintiff's assertion that, to his knowledge, his language never offended Ms. Green, but Defendants failed to establish that Plaintiff had any knowledge of the complaint prior to his testimony. Thus, it was not proper impeachment material, but was instead evidence Defendants offered for the truth of the matters asserted therein – that Plaintiff's language did, in fact, offend Ms. Green.

Similarly, the Court excluded from evidence an EED complaint allegedly filed by Mr. Ortiz based on statements given to him by Ms. Green on November 29, 2005, which were attached as exhibits to the EED complaint. Defendants offered the complaint again for impeachment purposes, but the Court ultimately excluded the complaint ruling that it could not go to Plaintiff's credibility because there was no evidence that Plaintiff had ever known of it. (6T .170:17-23). Defendants also argued that the EED complaint was relevant to show that Mr. Ortiz's actions in forwarding the EED complaint to the EED office and the DOC's actions in firing Plaintiff were reasonable. (6T 166:15-167:17). But the reasonableness of Plaintiff's termination and the EED investigation were not subject to contention during the trial – the real issue was the motivation for Defendant Ortiz's actions. The Court ruled that the addition of this evidence was cumulative and a waste of time in light of the already well-documented evidence of DOC policy and Plaintiff's language and statements, including audio recordings that were played before the jury and the testimony of Ms. Schoffstall, Mr. Green, Mr. Ortiz, and Mr. Plantier. (6T 175:19- 176:9). Because the EED complaint was thus not offered for any proper purpose, the Court correctly excluded it as hearsay.

iv.   Not Permitting the Reading of Statements Attributed to Ms.
      Schoffstall

Defendant Ortiz also argues that the Court erred by refusing to permit
Defendant Ortiz and Ms. Schoffstall to read into the record portions of a report that
Ms. Schoffstall drafted regarding Plaintiff's language. Defendant Ortiz argues that
this error is especially egregious because the Court permitted Plaintiff to read-in
portions of complaints that he had prepared. Review of the record reveals that the
Court properly limited the amount of reading done by witnesses throughout the
proceeding in accordance with its discretionary powers to limit cumulative
evidence without regard for whether the testimony was favorable to a particular
party.

During Ms. Schoffstall's direct, defense counsel asked Ms. Schoffstall to
read the report into the record. (9T 17:3-4). But the Court ruled that in light of the
fact that the report was admitted in evidence and the jury would have access to it,
reading the entire report was unnecessary and would waste time. (9T 17:5-13).
This was especially true in light of the fact that the jury would shortly be hearing
the recordings of Plaintiff's language. Instead, the Court allowed defense counsel
to question Ms. Schoffstall generally about the content of the report and allowed
Ms. Schoffstall to read in key portions thereof. (9T 17:3-13-19:25).The Court had
also already allowed Defendant Ortiz to testify generally about the content of the
report earlier in the proceeding. (6T 176:1-182:21). This ruling was an appropriate
exercise of the Court's discretion under Rule 403.[13]

The Court treated Plaintiff's witnesses in a similar fashion. The only slight
exception was on the first day of trial, where, in the midst of Plaintiff's testimony
on direct, the Court allowed Plaintiff to read several more extensive passages from
EED complaints he filed. (2T 61:25-87:67). Still, these passages were generally no
more than a paragraph or two. And contrary to Defendant Ortiz's assertions, the
Court allowed these read-ins not to favor Plaintiff but to help focus Plaintiff's
testimony; as the Court noted several times, Plaintiff had a tendency to wander in
his testimony and provide improper narrative information rather than respond to
questions directly. (2T 6:1-14; 2T 17:4-7).[14]

---

[13] Defendant Ortiz also argues that the Court prevented defense counsel from reading into the record the content of a
supplement report Ms. Schoffstall authored, but review of the record reveals that the Court made no such ruling. In
fact, defense counsel only asked Ms. Schoffstall to read in two paragraphs of the supplemental report, which Ms.
Schoffstall did. (9T 21:21-25:9).

[14] The Court also notes that at this early stage of the proceeding, the time constraints created by the adjournment and
the juror's schedules, discussed below in Part IV, had not yet become an issue

v.  Not Permitting EED Investigators to Testify As to Substance of
Their Investigations

Defendant Ortiz argues that the Court erred by excluding certain evidence
relating to an EED investigation into charges against Plaintiff. Again, the Court has
reviewed the record and finds no error.

Defendant Ortiz argues that the Court erred by excluding a report by EED
investigator Robert Roemer regarding his investigation into Ms. Schoffstall's
complaint against Plaintiff. The Court excluded this report because it contained
numerous hearsay statements, but the Court did permit – and in fact encouraged –
defense counsel to ask various questions regarding Mr. Roemer's investigation and
his drafting of the report. (7T 164:20-165:18). This included questions regarding
who Mr. Roemer interviewed in connection with the report and his corresponding
actions; the Court's only concern was that Mr. Roemer not be permitted to
introduce hearsay statements which would not be subject to cross-examination. (7T
166:3-167:3). Defendant Ortiz claims that the report was not being offered for the
truth of the hearsay statements it contained, but rather to show the thoroughness of
Mr. Roemer's investigation. But, as the Court noted at trial, defense counsel was
able to procure Mr. Roemer's testimony regarding his investigation process, thus
allowing Defendants to make their case that the investigation was thorough without
also admitting a variety of hearsay statements. (7T 164:9-165:4).

Defendant Ortiz also claims that the Court erred by preventing EED
investigator Charles Parker from testifying as to the contents of the audio
recordings of Plaintiff's language. But there was no real dispute regarding whether
Plaintiff was the individual on the tapes making the offensive comments or
whether Plaintiff's comments were offensive, and so the Court did not err by
refusing to allow Mr. Parker to testify regarding the fact that he recognized
Plaintiff's voice on the recordings on the grounds that such testimony was
unnecessary and cumulative. (10T 109:13-18). The Court also excluded from
evidence Mr. Parker's testimony regarding whether Plaintiff violated another DOC
policy regarding commenting on pending investigations; but the Court did so
because the evidence at trial establishing what violation Plaintiff was in fact
charged with did not include violation of this policy. The Court ruled that
testimony in this area would therefore be discursive and would distract the jury
from the central issues of the case, including whether Plaintiff was terminated for
his clear violations of the DOC's policy regarding offensive comments. (10T
123:1-124:13). Both of these rulings were proper.

vi.  Not Permitting Mr. Green to Read into the Record his Reasons
for Recommending Plaintiff's Termination

Defendant Ortiz argues that the Court erred by refusing to permit Mr. Green
to read the entirety of his letter to his supervisor at the DOC regarding his
investigation of the charges against Plaintiff. (10T 185:25-187:8). But the Court let
Mr. Green testify regarding the basic content of the letter, and the letter itself was
admitted into evidence. (10T 184:12-24; 186:7-15). Again, in light of these facts,
the Court was well within its discretion to exclude this evidence as cumulative and
a waste of time.

vii.  Not Permitting Certain Read-Ins from Plaintiff's Deposition
Transcripts

Defendant Ortiz argues that the Court erred by refusing to permit defense
counsel to read several passages of Plaintiff's deposition transcript. This argument
is without merit.

Federal Rule of Civil Procedure 32 governs the use of depositions at trial.
Under Rule 32(a)(3), a deposition of a party may be used by an adverse party for
any purpose, including as part of the adverse party's substantive proof, regardless
of whether the party is available to testify at trial. *See Colletti v. Cud Pressure
Control*, 165 F.3d 767, 773 (10th Cir. 1999). But the use of the deposition is still
subject to generally applicable rules of evidence, *see* Fed. R. Civ. P. 32(a)(1)(B),
and the trial court's discretion. *Colletti*, 165 F.3d at 773-74 (holding district court
did not abuse its discretion and finding that district court's decision to prevent
plaintiff from reading-in deposition did not affect plaintiff's substantive rights).

The Court permitted defense counsel to use Plaintiff's deposition extensively
at trial. During cross-examination, defense counsel referred Plaintiff to his
deposition transcript several times in an attempt to impeach Plaintiff's credibility.
(3T 169:21-172:5; 175:22-24; 198:18-199:21). The Court also permitted defense
counsel to read to the jury numerous passages from Plaintiff's deposition transcript
for a variety of admissible purposes. (10T 307:7-317:2).

The Court did not err in refusing to permit defense counsel to introduce a
few portions of Plaintiff's deposition. The first group of excluded excerpts
involves the issue of what unemployment compensation, if any, Plaintiff received
after his termination. Defendant Ortiz claims these portions of the transcripts were
relevant to the jury's determination of damages because, under the law, Defendant
Ortiz was entitled to a have the final compensatory damage award reduced by the
amount of unemployment compensation Plaintiff received. But, at trial, the Court
ruled that Defendant Ortiz had not carried yet its burden of proving that under the
law an offset for unemployment compensation was appropriate. (10T 290:5-13;

28

11T 16:20-17:4). The Court instead ruled that it would reconsider the issue of offsets after trial if the jury returned a verdict in Plaintiff's favor. As such, the information regarding Plaintiff's unemployment compensation was irrelevant and potentially confusing, and thus, the Court properly excluded it. And even if the Court's exclusions of these passages were somehow erroneous, the ruling did not in any way affect Defendant's substantial rights because the passages did not go to the issue of liability and the Court was prepared to apply any offsets post-verdict that were justified by the law. (10T 290:5-13; 11T 16:20-17:4).

The second group of excluded excerpts involves various statements regarding retaliation that Defendant Ortiz claims are inconsistent with Plaintiff's trial testimony. Unfortunately, Defendant Ortiz does not identify what specific trial testimony with which these deposition excerpts are inconsistent. On review, none of the excerpts appears to be inconsistent with Plaintiff's testimony at trial. The first few involve allegations against other DOC individuals who were not part of the lawsuit at the time of trial and so the Court properly excluded those excerpt as being irrelevant and, even if remotely relevant, a waste of time. (ECF No. 169-17) (33:22-34:25; 78:11-25; 80:5-17). The remaining excerpt is, despite Defendant's argument, generally consistent with Plaintiff's trial testimony.[15]

The remaining deposition excerpts involve various statements Defendant Ortiz claims would have been used to impeach Plaintiff's credibility. These excerpts do not lend themselves to general treatment, and so the Court will consider each specific excerpt in turn. In the first excerpt, Plaintiff testified that Defendant Ortiz was part of a conspiracy to fire Plaintiff in retaliation and further that Defendant: ". . . was a horrible man. He set me up. And if they didn't fire me downtown, he would have fired me some how[sic], if I walk  wrong. I let the cat out of [the] bag and they were pissed off." (ECF No. 169-16) (180:21-181:4). Defendant Ortiz argues that this testimony was an admission that someone other than Defendant Ortiz fired Plaintiff and, therefore, was probative of the primary issues in the case, including Defendant's *Mt. Healthy* defense. But the Court has already rejected Defendant's interpretation of the law, as discussed above, which substantially diminishes the probative value of this statement. And at trial, Defendants introduced extensive evidence that Defendant Ortiz did not make the final decision to terminate Plaintiff, as Defendant's brief documents. The Court thus properly excluded further evidence regarding this fact as being cumulative and

---

[15] *Compare* (39:2-9) ("Q: And did Ortiz retaliate against you? A: Yes, he did. Q: And how did he retaliate against you? A: By working with the other pricks I mentioned before. By firing me. First he suspended me and fired me.") *with* (3T 141:16-20) ("I was threatened by Mr. Ortiz to keep my mouth shut or I would get fired. In essence, he carried out what he promised, or carried out his promise to me.").

a waste of time.[16]

Defendant Ortiz claims the second excluded excerpt, in which Plaintiff testifies that Defendant Ortiz lacked people skills, (ECF No. 169-16) (120:9-121:2), was relevant to refute Plaintiff's testimony that Defendant's "alleged harassment" of Plaintiff was retaliatory. But Defendant Ortiz fails to identify what particular portion of Plaintiff's testimony this excerpt refuted, and Plaintiff's cause of action against Defendant Ortiz on trial was not based on a theory of general "harassment" but on specific conduct that resulted in Plaintiff's termination. At trial, Plaintiff testified extensively about his interactions with Defendant Ortiz – both before and after his protected activity – and this excerpt is not inconsistent with Plaintiff's description of those interactions. (6T 61:25-62:14; 63:25-64:15). In the absence of further explanation from Defendant, the Court can only conclude that it properly excluded this excerpt because it had minimal or no probative value and was cumulative.

The third excluded excerpt involves a confusing back and forth that culminates in Plaintiff's testimony that he was "[a]bsolutely not" afraid of being terminated at some unspecified time around when he filed unspecified EED complaints against Ortiz. (ECF No. 169-16) (164:8-165:20). Defendant Ortiz claims that this statement contradicted his trial testimony. But review of the trial testimony at issue makes this less clear. In the two portions of Plaintiff's trial testimony that Defendant Ortiz cites, Plaintiff clearly testifies that he did not include certain charges in his July 20th EED complaint against Defendant Ortiz because he was afraid of unspecified "retaliation." (3T 55:25-56:7; 3T 72:4-8). In neither passage does Plaintiff testify whether he was afraid specifically of being terminated. And the Court does not have the entirety of the deposition before it. Immediately after the passage Defendant Ortiz sought to introduce, Plaintiff appears to be provided further explanation of why he was not afraid of termination specifically, but the excerpt provided to the Court stops in the middle of this discussion. In light of the nature of the deposition excerpt – which makes it unclear whether Plaintiff's deposition testimony and trial testimony refer to the same EED complaints or even whether Plaintiff may have been afraid of some retaliation short of termination – the Court properly excluded the isolated reading of this excerpt because the potential to confuse the jury outweighed its limited probative weight.

---

[16] The Court also notes that Plaintiff's testimony that Defendant Ortiz was a "horrible man", was potentially prejudicial and possibly could have been the basis for an objection based on improper character evidence had Plaintiff sought to introduce this testimony.

viii.   Not Permitting Defense Counsel to Cross-Examine Dr. Tinari
Regarding Bayonne Settlement

Finally, Defendant Ortiz argues that the Court erred by refusing to permit defense counsel to cross-examine Plaintiff's economic expert, Dr. Frank Tinari, about whether his economic report included proceeds from the settlement of an unrelated lawsuit Plaintiff filed against another employer, the Bayonne Parking Authority (the "BPA Settlement"). At trial, the Court noted that the question of whether the BPA Settlement should be deducted from an award of compensatory damages appeared to involve both factual and legal questions that were best dealt with outside the presence of the jury. (5T 127:22-132:20). Ultimately, the Court prohibited Defendant Ortiz from introducing the evidence through Dr. Tinari to avoid confusion and to prevent the proceedings from diverging into the facts and circumstances of another lawsuit which, at best, would be a waste of time, and, at worst, could prejudicially suggest that Plaintiff was a serial litigant. *Mathis v. Phillips Chevrolet, Inc.*, 269 F.3d 771, 776 (7th Cir. 2001) (affirming district court's decision to exclude evidence of questionable relevance where evidence could prejudice plaintiff by painting him as litigious) (citing *Outley*, 837 F.2d at 592). In so ruling, the Court made no error. And ultimately, the Court's rulings did not affect Defendant's substantial rights because the information only went to the issue of compensatory damages, and the Court provided Defendant Ortiz with another opportunity to argue for an offset in its post-trial motions.

In sum, the Court has reviewed Defendant's motion for a new trial and finds that no grounds exist meriting such relief.

## IV.   Renewed Motion for Mistrial

Defendant Ortiz asks the Court to revisit Defendants' motion for mistrial, which the Court reserved judgment on until after trial. (10T 299:21-3). The Court acknowledges that the circumstances giving rise to Defendants' motion for mistrial were especially unfortunate, but the Court must ultimately deny the motion.

A district court has considerable discretion in deciding whether to grant a mistrial because it is "in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *Christmas v. City of Chicago*, 682 F.3d 632, 638 (7th Cir. 2012); *see also Johnson v. Elk Lake School Dist.*, 283 F.3d 138, 147 (3d Cir. 2002) (reviewing trial court's decision to deny motion for mistrial under abuse of discretion standard). The ultimate determination is whether, absent a mistrial, a party will be deprived of a fair trial. *Christmas*, 682 F.3d at 638; *see also United States v. Retos*, 25 F.3d

1220, 1224 (3d Cir. 1994) (affirming denial of motion for mistrial where incident at trial "did not deprive defendants of a fair trial").

The trial commenced on Monday, March 19, 2012. Plaintiff was represented by Ms. DeSoto and Mr. Curley, both solo practitioners. Defendants were represented by Mr. Nestor and Ms. Moon, attorneys from the twenty-five-attorney law firm of Lum, Drasco & Positan, LLC, with Mr. Nestor acting as lead counsel. On the first day, the jury was sworn, the parties made their opening statements, and Plaintiff was sworn and began his direct testimony. On Tuesday, March 20th, Plaintiff's testimony continued. On Wednesday, March 21st, Plaintiff's testimony concluded, and Plaintiff's counsel also called to the stand Mr. Guz, Beverly Hastings, and Mr. Beet as witnesses. This created a scheduling issue, as the Court had planned to sit Thursday morning, but Plaintiff's expert witness, Dr. Tinari was not available until Friday. After the Court confirmed that Plaintiff was resting his case other than calling Dr. Tinari on the issues of damages, the Court asked defense counsel to be prepared to begin their case Thursday morning. (4T 197:6-198:20). The Court asked Plaintiff to be prepared to call Dr. Tinari on Friday.

Thereafter, attorneys from Mr. Nestor's firm notified the Court that Mr. Nestor would be unable to continue with the trial because of the unexpected illness. (4TA 8:1-24). On the morning of Thursday, March 22nd, Defense counsel requested that the Court grant a mistrial or, in the alternative, a significant continuance to allow new lead counsel to pick up the case. The Court indicated that it was unlikely to grant a mistrial and advised defense counsel to be prepared to move forward with the case immediately. (4TA 9:6-11). Ultimately, the Court granted Defendants a brief adjournment to effect the introduction of new lead counsel to the case. The Court adjourned Dr. Tinari's testimony until the following Monday and adjourned the remainder of the proceedings until the following Wednesday. The Court was unable to grant a further adjournment because of the schedules of the jurors – had there been a delay of even several additional days, the Court would have had less than six jurors, including alternates, which would have necessitated empanelling a new jury and starting the trial afresh. (5T 44:15-45:3).

On Monday, March 26th, Plaintiff called Dr. Tinari and after his testimony was complete, the Court adjourned for the remainder of the day. Plaintiff's counsel requested permission to call Ms. Schoffstall to the stand, but the Court refused to permit counsel from doing so, noting that Plaintiff had represented last week that he would rest his case other than calling Dr. Tinari. (5T 155:17-156:18). On Wednesday, March 27th, the Court, at defense counsel's request, recalled Plaintiff and Dr. Tinari to the stand to testify regarding other income Plaintiff may have received. On Wednesday afternoon, Defendants proceeded with their case, which continued through the following Monday, April 2nd. On April 2nd, both parties

32

rested. On April 3rd, the jury heard closing arguments, the Court charged the jury on the law, and the jury began deliberations that afternoon. Early in the afternoon of April 4th, the jury returned its verdict. The Court adjourned early that day to provide defense counsel with additional time to prepare its evidence regarding the issue of punitive damages. The following day, April 5th, the jury heard evidence regarding punitive damages and then rendered its special verdict.

A balance of the potential for prejudice to both parties illustrates that a mistrial was not appropriate. Plaintiff had already completed his entire case-in-chief – the only remaining issue to address was damages. Had the Court granted a mistrial, it would have severely prejudiced Plaintiff because Defendants would have had the advantage of preparing for trial with a preview of Plaintiff's entire case on liability. *See Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (defending preference for joint trial of criminal defendants noting that such trials avoid "randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand"); *Am. Motorists Ins. Co. v. Starnes*, 425 U.S. 637, 643-44 & n.5 (1976) (implicitly recognizing the advantage of having preview of opposing party's case but holding Texas venue statute did not allow for such preview); *United States v. Gonzales*, 110 F.3d 936, 945 (2d Cir. 1997) (refusing to find alleged error in jury charge constitutes plain error because, in part, holding would encourage trial counsel to avoid taking objections in hopes of securing new trial with "the advantage of a complete preview of the government's evidence and strategy"); *cf. United States v. Basciano*, No. 03-CR-929, 2006 WL 2270432, at *6 (E.D.N.Y. June 30, 2006) ("If the Government is concerned about the strategic advantage gained by the defense in having additional time to prepare for its case for this second trial, I note that a retrial following a deadlocked jury helps and prejudices both sides, as the Government has also seen a preview of the defense case."). And, unfortunately, the Court was not in a position to grant a lengthier adjournment because of the juror's schedules. Had the Court granted a longer adjournment, the Court would have had to empanel an entirely new jury and start again from scratch, resulting in a de facto new trial.

While the Court is sensitive to the needs of defense counsel, the Court believed that, under the circumstances, a brief adjournment would be sufficient to mitigate any prejudice Defendants might suffer. Defense counsels' performance during the trial proceedings proved that the Court's belief was correct.

The trial was factually and legally straightforward. It involved three claims – two of which were effectively identical for all factual and legal purposes – against three defendants. Presentation of the evidence by both parties took approximately

seven days in total,[17] even with frequent interruptions to address legal issues. Plaintiff called five witnesses, including himself, and new lead counsel only had to conduct cross-examination on one of those five. Defendants called seven witnesses, including Defendants Ortiz and Plantier, and presentation of Defendants' entire case took only three and a half days.

Mr. Nestor's performance during the first three days of the proceedings did not result in an unfair trial. At no point did Mr. Nestor, an experienced trial attorney, present to the Court as being ill or otherwise impaired: he conducted examinations, made legal arguments, objected to evidentiary rulings, and cross-examined Plaintiff's witnesses.[18]

Nor is this a situation in which Defendants had to start over with completely new representation to go forward with the case. Defendants were represented not by Mr. Nestor alone, but by the law firm of Lum, Drasco & Positan, LLC. Ms. Moon, though not lead counsel, was present and involved throughout the entirety of the trial proceedings and all pretrial preparations. Ms. Moon graduated from law school in 2007 and was admitted to practice law in this state that same year. At the time of trial, she had been working on the case for well over two years. Though she had limited courtroom experience, during the trial she proved herself a capable and knowledgeable advocate: she frequently objected to the admission of evidence, made legal arguments, and examined witnesses, including on cross. Her commendable performance testified to her legal acumen and knowledge of the substantive law and the facts of the case.

Ultimately, Ms. Kelsey was asked not to start a trial from scratch but to step into a straightforward lawsuit and help Ms. Moon present Defendants' already prepared case and to cross-examine Plaintiff's damages witness. Ms. Kelsey is an experienced trial attorney who has been practicing in the State of New Jersey since 1983. Having received no representation to the contrary, the Court can only assume that other attorney's at Ms. Kelsey's firm, including Ms. Moon, prepared Defendants' case – which, again, took only three and a half days to present – well in advance of trial.[19] Ms. Kelsey's task was to familiarize herself enough with the

---

[17] Plaintiff's case-in-chief began on the afternoon of Monday, March 19th, and proceeded through all of the following Tuesday and Wednesday, for a total of two and a half days. Plaintiff's damages case took approximately one day in total – half a day on Monday, March 26th and half a day on Wednesday, March 28th. Defendants' case took the second half of Wednesday, March 28th, all of Thursday, March 29th, and Friday, March 30th, and most of the following Monday, April 2nd, for a total of approximately three and a half days.

[18] The Court also permitted defense counsel to read-in portions of Plaintiff's deposition transcripts based in part on defense counsel's claim that doing so would help "cure the prejudice" that *may* have arisen from any perceived underperformance by Mr. Nestor. (10T 292:19-22).

[19] Defendants had more than sufficient notice and time for counsel to properly prepare their case. The Court originally scheduled trial for August 9, 2011, a date that stood until August 1, 2011. Because certain evidentiary

facts and the law to represent her clients effectively, and the approximately five and a half days of adjourned time should have been a sufficient for an attorney of her skill and experience to do so. Ms. Kelsey's fine work at trial illustrates how the adjournment was, in fact, sufficient. That the trial may not have been perfect is not a basis for mistrial. *See United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) ("Given 'the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.'") (quoting *United States v. Hastings*, 461 U.S. 499, 508-09 (1983)).

While Mr. Nestor's illness was regrettable and unfortunate, and while the Court is sympathetic to the difficult position this created for defense counsel's firm, and Ms. Moon and Ms. Kelsey especially, the circumstances of this case do not merit a mistrial. This case may have been more stressful to try than is typical, but Defendants still received a fair trial.

### V. Motion to Alter of Amend Judgment Pursuant to Fed. R. Civ. P. 59(e)

Defendant Ortiz moves pursuant to Federal Rule of Civil Procedure 59(e) to alter or amend the judgment of compensatory damages against him to offset Plaintiff's income of unemployment benefits and the BPA Settlement. The Court must deny Defendant's motion in its entirety.

#### A. Legal Standards

Pursuant to Rule 59(e), a party may file "a motion to alter or amend a judgment" based on one of three recognized grounds: (1) because of an intervening change in law; (2) the availability of new evidence not previously available; or (3) to correct a clear error of law or prevent manifest injustice. *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). The defendant typically bears the burden of proving that an offset to damages is appropriate. *Blum v. Witco*, 829 F.2d 367, 375 (3d Cir. 1987). "Under the collateral benefit rule, payment which a plaintiff receives for his or her loss from another source is not credited against the defendant's liability for all damages resulting from its wrongful or negligent act." *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir. 1983).

#### B. Unemployment Benefits

---

motions by the parties required further proceedings, and the Court wanted to give the parties additional time to discuss settlement, the Court rescheduled the trial several times, each time giving counsel more time to prepare. On January 19, 2012, the Court set the trial for March 13, 2012. On March 6, 2012, the Court pushed the trial back a few more days to March 19, 2012.

Unemployment compensation, social security, and similar forms of social insurance are collateral benefits that do not require an offset. *See Craig*, 721 F.2d at 83-85 (discussing damages for back pay under Title VII). This rule applies unless there's a state law or statute allowing for recoupment of unemployment when back pay is awarded and the defendant is the state. *See Dillon v. Coles*, 746 F.2d 998, 1007 (3d Cir. 1984) (allowing setoff based on Pennsylvania statute allowing recoupment); *see also Gelof v. Papineau*, 829 F.2d 452, 455 (3d Cir. 1987) ("[I]n cases in which the state has not defined the social insurance benefit by including a provision for recoupment against back pay awards, *Craig* is the controlling precedent."). In *Dillon*, the Third Circuit allowed the offset after finding that the Pennsylvania statute "establish[ed] . . . a duty by the plaintiff to repay the unemployment benefits from the [jury] award." *Id.* at 1007. The Court of Appeals did so to avoid wasting public funds by requiring the state to institute a separate suit it is authorized to bring to recoup part of the back pay award. *Id.* This determination turned in large part of the fact that the defendant in *Dillon* was the state itself. *Id.* Because the Court finds that no such law or statute clearly allows for recoupment in this case, it will not offset the jury verdict to reflect unemployment compensation.

Defendant Ortiz argues that there is a New Jersey statute, N.J.S.A. 43:21-5, allowing for recoupment of unemployment benefits and thus, an offset is appropriate in this case, as it was in *Dillon*. The New Jersey statute provides that an individual who has been discharged for misconduct is not eligible to receive unemployment unless the individual is reinstated in his position as a result of a mediation or arbitration:

> An individual shall be disqualified for [unemployment compensation] benefits . . . (b) For the week in which the individual has been suspended or discharged for misconduct connected with the work . . . . In the event the discharge should be rescinded by the employer voluntarily or as a result of mediation or arbitration, this subsection (b) shall not apply . . .

But the statute goes on to prohibit double-recovery by requiring repayment in certain circumstances:

> this subsection (b) shall not apply, provided, however, an individual who is restored to employment with back pay shall return any [unemployment compensation] benefits received under this chapter for any week of unemployment for which the individual is subsequently compensated by the employer.

Thus, if a party received unemployment compensation after a discharge, but the discharge is later rescinded and the individual receives a back pay award from his employer, the party must return the unemployment compensation to the state.

Here, it is not clear that the New Jersey statute at issue even allows for recoupment on these facts. By a plain reading of the statute, it does not appear to apply to Defendant Ortiz's situation. Defendant Ortiz was found liable in his individual capacity, the Court having dismissed the claims against him in his official capacity long before trial. Thus, any award of back pay Plaintiff received will not be from his employer, the DOC, but from Defendant Ortiz, the tortfeasor. And the jury's verdict did not restore Plaintiff to employment, nor was it the "result of mediation or arbitration." The Pennsylvania statute at issue in *Dillon* did not contain any of these requirements, and applied without regard to who made the back wages payment and whether Plaintiff was restored to employment. *See id.* (citing 43 Pa. Stat. Ann. § 874(b)(3)). If the Court were to read these requirements out of the New Jersey statute, it would be violating the most basic canon of statutory interpretation which requires the Court to begin by reading the plain language of the statute. *See, e.g.*, *Health Maint. Org. of New Jersey, Inc. v. Whitman*, 72 F.3d 1123, 1128 (3d Cir. 1995).[20]

Thus, the Court is not in the same position as the Court of Appeals was in *Dillon* and cannot merely hold that because the defendant, as the state, has a clear right to recoupment, the Court can apply an offset to save the state time and money. In light of Defendant Ortiz's failure to carry his burden, the Court must deny his request for an offset of Plaintiff's unemployment compensation.

## C.  The BPA Settlement

Defendant Ortiz next argues that a the judgment against him should be offset to account for the $68,000 BPA Settlement because the BPA Settlement was taxable income that was not specifically allocated to personal injuries or sickness, and because Plaintiff was only in a position to receive the BPA Settlement because he was no longer working at the DOC. The Court remains unconvinced.

First, Defendant Ortiz does not explain why the taxability of the BPA Settlement should drive the analysis of whether an offset is appropriate. His argument assumes that all taxable income post-termination should be offset from an award of back pay, but he provides no legal authority for that proposition. The absence of authority is fatal to Defendant's argument.

Second, Defendant Ortiz's argument that he is entitled to an offset of the BPA Settlement because his wrongful conduct is a but-for cause of Plaintiff being employed by the BPA and thus was a but-for cause of Plaintiff being able to sue the BPA and collect a settlement is contrary to the collateral benefit rule and

---

[20] The Court recognizes that the fact the State of New Jersey has agreed to indemnify Defendant Ortiz complicates the analysis, but the Court need not reach the legal implications of that agreement because recoupment does not appear to be available to the State under the statute at issue.

common sense. The rationale for the rule is that "a wrongdoer should not get the benefit of payments that come to the plaintiff from a source collateral to the defendant." *Craig*, 721 F.2d at 83. After he was terminated, Plaintiff went to work at the BPA and was later involved in a successful lawsuit against the BPA. Why the benefit of this award "should be shifted to the defendant, thereby depriving the plaintiff" of it in light of the collateral benefit rule is beyond the Court's understanding. *Id.* And Defendant Ortiz does not provide any authority to support his contention. Again, without further explanation or legal authority, the Court cannot see how Defendant Ortiz's argument can succeed.[21]

In light of Defendant Ortiz's failure to carry his burden, the Court must also deny his motion with respect to an offset for the BPA Settlement.

### VI.     Motion for Waiver of Supersedeas Bond Pursuant to Fed. R. Civ. P. 62

Defendant Ortiz moves for an order waiving the requirement for him to post a supersedeas bond to stay execution of the judgment against him during his appeal. Defendant Ortiz argues that he is entitled to waiver as a matter of law pursuant to Rule 62(f) because he is an officer of the State of New Jersey. In the alternative, Defendant Ortiz argues that the Court should waive the requirement under Rule 62(d) because there exists an adequate alternative means of securing the jury's award. Because the Court finds that waiver is appropriate pursuant to Rule 62(d), the Court declines to reach the issue of whether Defendant Ortiz is entitled to waiver pursuant to Rule 62(f).

Judgment debtors who are appealing a trial court's decision may move for a stay of a monetary judgment under Federal Rule of Civil Procedure 62(d). That rule provides that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond . . . . The stay takes effect when the court approves the bond." The amount of the bond should normally be equal to the amount of the judgment against the appellant. *Transamerica Occidental Life Ins. Co. v. Total Sys., Inc.,* No. 08-CV-1323, 2011 WL 2447520, at *2 (D.N.J. July 23, 2009). The Third Circuit has not yet addressed whether Rule 62(d) allows district courts to waive the supersedeas bond requirement, but district courts in this circuit have joined Courts of Appeals of sister circuits in holding that Rule 62(d) grants them discretionary authority to waive the bond. *See, e.g.*, *Church & Dwight Co., Inc. v. Abbot Lab.*, No. 05-2142, 2009 WL 2230941, at *14 (D.N.J. July 23, 2009) (citing district court cases within the circuit that support the granting of waivers). The Court

---

[21] At oral argument on this motion, defense counsel declined to address any of the failings the Court identifies here and instead relied chiefly on Defendant's briefs. (12T 63:10-64:1).

should only exercise such discretion in exceptional circumstances and where there exists an alternative means of securing the judgment. *Transamerica*, 2011 WL 2447520, at *2; *Church & Dwight*, 2009 WL 2230941, at *14.

In determining whether extraordinary circumstances exist, several district courts in this circuit have considered the following factors set forth by the Seventh Circuit Court of Appeals: (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position. *Church & Dwight*, 2009 WL 2230941, at *14 (citing *Dillon v. City of Chicago*, 866 F.2d 902 (7th Cir. 1988)). "[T]he factor that is most commonly used to waive the requirement is the financial hardship that the bond may impose on the appellant." *Hurley v. Atlantic City Police Dept.*, 994 F.Supp. 371, 377 (D.N.J. 1996) (citation omitted). The would-be appellant bears the burden of showing that "posting a full bond is impossible or impracticable" and "to propose a plan that will provide adequate . . . security for appellee." *Montalvo v. Larchmont Farms, Inc.*, No. 06-2704, 2011 WL 6303247, at *2 (D.N.J. Dec. 15, 2011) (internal quotation marks omitted).

Here, a discretionary stay is warranted. The State of New Jersey has, pursuant to its indemnity agreement, agreed to indemnify Defendant Ortiz for the entirety of the judgment against him, including costs and attorney's fees. This serves as an adequate alternative security for Plaintiff as appellee. Plaintiff has put forth no evidence suggesting that collection of the judgment from the State would be complex or costly or undermining the Court's general confidence that the State will have the necessary funds to perform under the indemnification agreement. And as Plaintiff acknowledges in his brief, Defendant Ortiz produced evidence at trial that it would be a great financial hardship for him to pay the judgment against him because of his outstanding liabilities and his limited disposable income. (12T 32:6-16; 12T 35:7-15). This same evidence tends to establish that it would be impracticable for Plaintiff to post a full bond as security for the judgment against him.

But the Court is mindful of Plaintiff's concern that the State of New Jersey may "change its mind", and the Court will therefore impose further conditions on the waiver. In the event that the State decides that it will not indemnify Defendant Ortiz in full, Defendant Ortiz must immediately notify Plaintiff's counsel and the Court. Plaintiff may thereafter move for appropriate relief, including modification of the Court's order.

**VII.   Conclusion**

For the foregoing reasons, the Court denies Defendant Ortiz's post-trial motion for judgment as a matter of law, a new trial, or to alter or amend the judgment, in its entirety. The Court also denies Defendant's motion for a mistrial. The Court grants Defendant's motion to waive the supersedeas bond requirement subject to the conditions described above. An appropriate order follows.

<u>      /s/ William J. Martini      </u>
**WILLIAM J. MARTINI, U.S.D.J.**